

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 23, 2016

**BY ECF AND EMAIL**

The Honorable Victor Marrero
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

        Re:    **United States v. Joseph Steele,**
                 **S1 15 Cr. 836 (VM)**

Dear Judge Marrero:

      By this letter, the Government responds to defendant Joseph Steele's motion to offer into evidence the expert report of New York City Department Criminalist Vanessa Martinez under Federal Rule of Evidence 803(8)(a)(iii). Without subjecting Ms. Martinez to voir dire regarding the methods used, their appropriateness here, and the limitations of the conclusion they enabled her to draw, the defendant proposes offering the report under the "public records" exception to the hearsay rule.

      As set forth in greater detail below, Ms. Martinez's expert report is not a "public record" within the meaning of Rule 803(8)(a)(iii), and, as a threshold matter, is admissible only after the Court concludes that the expert and her report meet the requirements of Federal Rule of Evidence 702. Moreover, the introduction of the report on its own – without Ms. Martinez's explanation to the jury of her methods and procedures – has great potential to confuse and mislead the jury, and therefore does not pass muster under Federal Rule of Evidence 403.

      Though the Government does not object to the defendant calling Ms. Martinez to testify, and asking her to explain her findings and conclusions, the Court should not permit the defendant to offer the report on its own and out of its proper context. The Government therefore respectfully requests that the Court deny the defendant's motion.

**Relevant Background**

      At trial, the Government expects the evidence to demonstrate, in part, that on or about October 10, 2015, in the vicinity of Macombs Road in the Bronx, a pedestrian observed a man in a burgundy jacket pointing a firearm at another man dressed in a black sweater. The pedestrian entered a nearby building, after which time he heard one gunshot and called 911.

NYPD officers responded to the scene and observed a man in a burgundy jacket walking away. Once the man realized that police had arrived, the man ran away. The officers followed. During the chase, one officer observed the man in the burgundy jacket with a black object in his hand. The officer then saw the man appear to toss the object toward the street and heard a loud metallic clatter, like metal hitting concrete, from a line of parked cars. Officers caught up with the man and placed him under arrest. Minutes later, along the path of the foot pursuit, an officer recovered a black firearm. An officer also recovered from the scene an empty shell casing, indicating that a firearm had been discharged. Ballistics testing revealed that the shell casing recovered matched the firearm recovered.

The man in the burgundy jacket was identified as Joseph Steele, the defendant. He wore the jacket until he was brought to the precinct, where the burgundy jacket, along with other items, were processed and maintained by the NYPD as "arrest evidence." The burgundy jacket appeared to be made predominately of imitation leather (polyurethane) commonly referred to as "pleather." The cuffs around the sleeve of the jacket appeared to be made of cotton and are covered by the pleather sleeves.

During the investigation, the Government asked the NYPD Police Laboratory to test the burgundy jacket for the presence of gun shot residue. NYPD Criminalist Vanessa Martinez of the Firearm Analysis Laboratory was assigned to examine the jacket, and prepare a report. In her report, Ms. Martinez concluded that "visual and microscopic examination of lab item 12 (jacket) failed to disclose physical effects or residues consistent with the discharge of a firearm." The Government produced Ms. Martinez's report to the defendant shortly after she prepared it.

In preparing for trial, the Government met with Ms. Martinez to discuss her examination of the jacket and her findings. During these meetings, the Government learned, among other things:

- In examining the jacket, Ms. Martinez used a low power microscope, and not a Scanning Electron Microscope ("SEM"). The SEM is now the industry standard tool for identifying gunshot residue; a low-powered microscope is, however, adequate to inspect the clothing of shooting *victims* or other surfaces already known to have been struck by a bullet, largely to estimate the distance from which the victim was shot;

- Although the NYPD Police Laboratory has an SEM, it is not used to examine clothing for gunshot residue due to resource allocation issues. Indeed, the Police Laboratory does not have a standard operating procedure for using the SEM to test for gunshot residue;

- Unless the shooter's clothes were somehow burned or singed by the gunfire—most commonly when the shooter sustains a self-inflicted wound—gun shot residue is not commonly found on the shooter;

- Certain materials, such as cotton, are more efficient at retaining gun shot residue. Pleather and other low friction surfaces are less likely to retain gun shot residue;

- Wind, friction, water, and other environmental conditions can easily brush gun shot residue from clothing, especially a low-friction surface like polyurethane, as can the act of running;

- Unless a surface is properly handled (to mitigate contamination) and a timely sample is taken using special adhesives, the passage of time reduces the likelihood that gunshot residue will persist on a surface.

Given that Ms. Martinez did not examine the jacket with an SEM; that the defendant (and his clothing) did not sustain a gunshot wound or other physical damage from the gun; that the defendant's jacket was made of a low-friction surface; that the defendant ran immediately after the shooting; that the defendant wore his jacket at all times during his arrest and transport to the precinct; and that the test was conducted several months after the incident and without a timely sample of the surface having been taken, the Government determined that Ms. Martinez's testimony would be less helpful and more confusing to the jury. The Government therefore informed the defendant that Ms. Martinez would not be called in the Government's case-in-chief, but provided the defendant with Ms. Martinez's contact details so that counsel could discuss these issues with Ms. Martinez, and prepare her for trial testimony in the event the defendant wanted to call Ms. Martinez in his case.

The Government then learned that the defendant intends to introduce Ms. Martinez's expert report as a stand-alone document, without giving the jury the benefit of Ms. Martinez's testimony, and without giving the Government the opportunity to elicit the facts set forth above, including that an SEM was not used in the examination and that gunshot residue cannot be found on shooters without it, absent a self-inflicted wound or other physical damage to the shooter's clothing from the gunfire.

The Government still does not intend to call Ms. Martinez to testify in its affirmative case. The Government does not object to the defendant calling Ms. Martinez as a witness in the defense case, but objects to the introduction of her report without her testimony.

## Discussion

Entitled "Public Records and Reports," Rule 803(8) of the Federal Rules of Evidence allows for the admission, against the Government in criminal cases, of "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies setting forth . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed. R. Evid. 803(8). As one commentator has noted, this exception to the hearsay rule is based in part upon the disruptive effect of bringing public officials into court to testify about matters that have generally been accurately reported and recorded is avoided.

Use of the record also serves the public convenience by saving time and the expenditure of public money. Moreover, the record is likely to be much more reliable than the official's often hazy recollection. MICHAEL H. GRAHAM, FEDERAL PRACTICE & PROCEDURE: FEDERAL RULES OF EVIDENCE, Sec. 6759 (Interim ed. 1992). *See also Vanadium Corp. of Am.* v. *Fidelity & Deposit Co. of Maryland*, 159 F.2d 105, 109 (2d Cir. 1947) ("[T]his exception

is recognized because of necessity or the inconvenience which would result from always requiring the testimony of the official in person to the facts he has recorded; and his official duty supports the requirement that there be found some circumstantial probability of trustworthiness").

"[E]xpert testimony may help a jury understand unfamiliar terms and concepts." *United States* v. *Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991). However, a trial court is obligated to act as a gatekeeper with respect to expert testimony. *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993): *see also Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir.2008). "The primary locus of [that] obligation is [Federal Rule of Evidence] 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Daubert*, 509 U.S. at 589. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702.

All experts must meet the basic requirements of Rule 702 of the Federal Rules of Evidence. This Court considers (1) whether the proposed expert is qualified; (2) whether the expert bases his opinion upon reliable data and methodology; and (3) whether the proposed testimony will assist the trier of fact. *See, e.g., Nimely* v. *City of New York*, 414 F.3d 381, 396–97 (2d Cir.2005).

Expert testimony must help, but not usurp the province of, the trier of fact. *Bilzerian*, 926 F.2d at 1294: *see also United States* v. *DiDomenico*, 985 F.2d 1159, 1163 (2d Cir.1993) ("A district court may admit the testimony of a qualified expert if his knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.") (internal quotation marks omitted). "In determining whether such evidence will assist the jury, the district court must make a common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States* v. *Locascio*, 6 F.3d 924, 936 (2d Cir.1993) (internal quotation marks omitted).

Expert testimony, like all testimony, is subject to the requirements of Rule 403. Rule 403 provides for the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed.R.Evid. 403.

Additionally, "Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Daubert*, 509 U.S. at 595 (internal quotation marks omitted).

As an initial matter, FRE 803(8)(a) is not designed for the report at issue. Ms. Martinez is available to testify. Indeed, the Government has offered, and will continue to offer, to help the defendant meet with Ms. Martinez and to prepare for her testimony in the defendant's case-in-chief. If the defendant wants the jury to hear the conclusions contained in the report, there is no legitimate reason for the defendant to decline to call her.

The defendant's reliance on *Beech Aircraft Corp.* v. *Rainey*, 488 U.S. 153 (1988) is misplaced. First, the report at issue here is not an agency investigative report, like the Navy Judge Advocate General's internal report into a plane crash. Here, the report is a single expert opinion, with no discussion or elaboration of its methods, their limitations, or their reliability in the context of the evidence at issue. Second, the *Beech Aircraft* Court expressly cabined its holding by noting "[a]s the trial court *had already determined* that certain of the JAG's Report's conclusions were trustworthy, he [the judge] rightly allowed them to be admitted into evidence." *Id.* at 170 (emphasis added). *Accord*, *United States* v. *Nelson*, 365 F. Supp.2d 381, 389 (S.D.N.Y 2005) (holding that "*in the absence of any indication that* [the Police Commissioner's] *finding is not trustworthy*" it is admissible under FRE 803(8)(C)). Here, no court has yet made the determination whether and to what extent the conclusions offered by Ms. Martinez *are* trustworthy given the limitations of the testing performed, limitations about which Ms. Martinez has been candid. That threshold determination must be made by the court pursuant to its gatekeeping function under Rule 702, regardless of whether the expert opinion takes the form of hearsay or live testimony.

In short, though the defendant is entitled to elicit the information contained in Ms. Martinez's report, he cannot do so without first questioning Ms. Martinez in Court and satisfying the requirements set forth in FRE 702(b) and FRE 702(c). The Government acknowledges that Ms. Martinez is an expert in gunshot residue testing, and the Government will not oppose Ms. Martinez's qualification as an expert. The Court and the jury, however, are entitled to evaluate Ms. Martinez's conclusions alongside testimony about her methods and procedures, and in particular their limitations given the nature of the evidence tested here.

Finally, admitting the report into evidence without allowing the jury to evaluate the conclusions within the context of the limitations of the procedures used does not pass muster under FRE 403. For the jury to understand the significance of Ms. Martinez's conclusion – that her testing "failed to disclose physical effects or residues consistent with the discharge of a firearm" – without knowing that she used a low power microscope as opposed to an SEM; without knowing that an SEM is the industry standard for microscopically detecting gunshot residue on a shooter; without knowing that gunshot residue is unlikely to persist on this particular surface (polyurethane) given both its nature and its handling after the shooting; and without knowing the other factors described above, is highly confusing and misleading.

  For the foregoing reasons, the Court should deny the defendant's motion to introduce Ms. Martinez's gunshot residue report under the public records exception to the hearsay rule.

          Respectfully submitted,

          PREET BHARARA
          United States Attorney

    By:  /s/ Jilan Kamal
       Jilan Kamal / Hadassa Waxman
       Assistant United States Attorneys
       (212) 637-2192 / 2277